UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ROBERT M. MATYE,

                                 Plaintiff,

                                                              **MEMORANDUM & ORDER**

            -against-

                                                              **12-CV-5534 (NGG) (VVP)**

THE CITY OF NEW YORK,
THE NEW YORK CITY DEPARTMENT
OF EDUCATION, and SHARON TERRY,

                                 Defendants.

-----------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Robert M. Matye brings this action for retaliation in violation of the

Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., against Defendants City of

New York (the "City"), New York City Department of Education (the "DOE"), and Sharon

Terry ("Terry"). (See Compl. (Dkt. 1).) Before the court is Defendants' motion for summary

judgment. (Not. of Mot. for Summ. J. (Dkt. 50).) For the reasons explained below, Defendants'

motion is DENIED.

## I.     BACKGROUND

### A.     Facts

Many facts are undisputed. Where facts are in dispute, the court takes the facts as stated

in Plaintiff's deposition or affidavit, and/or in the light most favorable to Plaintiff. However,

Plaintiff's Rule 56.1 counter statement purports to dispute a number of facts that, upon review of

Plaintiff's cited evidence, are not actually in dispute. See Fed. R. Civ. P. 56(c)(1) ("A party

asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular

parts of materials in the record . . . or showing that the materials cited do not establish the

1

absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). And where Plaintiff purports to dispute an issue of fact by pointing to statements contained in his affidavit, submitted in opposition to Defendants' motion, that contradict his own prior deposition testimony, the court discounts the affidavit. See Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). Finally, Plaintiff's Rule 56.1 counter statement contains a number of objections in which Plaintiff does not cite to contrary or rebuttal evidence but rather contends that Defendants' characterization of a fact is unduly argumentative or adversarial, or that Defendants are improperly asking Plaintiff to confirm what is or is not contained in a document. In each of these instances, the court has performed its own careful review of the evidence cited by Defendants to determine what the evidence shows, and which facts are and are not undisputed.

### 1.    Plaintiff's First Two Years of Employment with the DOE

Plaintiff began working for the DOE at the beginning of the 2008-2009 school year, as a newly-appointed probationary theatre teacher. (Defs.' Local Civil Rule 56.1 St. of Undisputed Facts ("Defs.' 56.1") (Dkt. 52) ¶ 3; Pl.'s Counter St. of Undisputed Facts ("Pl.'s 56.1") (Dkt. 58) ¶ 3.) He was hired by George Andrews, the principal of Public School ("P.S.") 224, an elementary school. (Defs.' 56.1 ¶¶ 3-4; Pl.'s 56.1 ¶¶ 3-4.) Plaintiff worked at P.S. 224 for two years, where he taught theatre classes to students in pre-kindergarden through sixth grade. (Defs.' 56.1 ¶¶ 3, 5, 9-10; Pl.'s 56.1 ¶¶ 3, 5, 10; Annual Prof'l Perf. Review for Robert Matye, School Year 2009-2010 (Decl. of Asst. Corp. Counsel Benjamin Stockman ("Stockman Decl."), Ex. D (Dkt. 53-4)).) While he was teaching at P.S. 224, Plaintiff developed individualized lesson plans for each grade level, on a daily basis. (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)

During Plaintiff's two years at P.S. 224, his job performance was evaluated. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) He received "satisfactory" ratings for both years. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8; Tr. of the Dep. of George Andrews[1] ("Andrews Dep.") (Lefkowitz Affirmation, Ex. I (Dkt. 55-10)) at 17:18-19, 10:11-13, 10:24-11:5.) Andrews testified that Plaintiff "had some classroom management concerns," such as issues with lesson-planning or disruptive students, but he also noted that these were typical concerns that "any new teacher would face." (Andrews Dep. at 9:12-11:5.)

Plaintiff was placed in "excess" for his second year at P.S. 224, the 2009-2010 school year. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9; Andrews Dep. at 23:19-21.) Being placed in excess was a budgetary matter, and was unrelated to Plaintiff's performance. (Andrews Dep. at 24:6-17.) Due to budget deductions or a decrease in registration, P.S. 224's budget was reduced, and the theatre teaching position was cut. (Id. at 23:22-24:5.) While Plaintiff was in excess, he continued to teach at P.S. 224, but he was available to be hired by another school. (Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)

Prior to the start of the following school year (2010-2011), Defendant Sharon Terry, the principal of Intermediate School ("I.S.") 230, who was considering hiring Plaintiff to work at I.S. 230, contacted Andrews regarding Plaintiff. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) Andrews testified that he shared his impression that Plaintiff had some classroom management issues common to new teachers. (Andrews Dep. at 24:18-26:3.) Overall, Andrews gave Plaintiff a neutral, but satisfactory, reference. (Andrews Dep. at 27:5-15; Tr. of the Dep. of Sharon Terry ("Terry Dep.") (Lefkowitz Affirmation, Ex. F (Dkt. 55-7)) at 14:15-23, 15:5-9.)

---

[1] In support of their motion, Defendants submitted excerpts from a number of depositions that were taken during discovery of this case. In opposition, Plaintiff submitted the full transcripts of most of these depositions (with the exception of Assistant Principal Donna Vitale's deposition); accordingly, the court will generally reference Plaintiff's submissions when citing to deposition testimony in this Memorandum and Order.

Plaintiff was interviewed for the I.S. 230 position by Principal Terry, Assistant Principal Donna Vitale, and two other assistant principals. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 14; Tr. of the Dep. of Robert Matye ("Matye Dep.") (Lefkowitz Affirmation, Ex. E (Dkt. 55-6)) at 57:24-58:9.) During the interview, the administrators informed Plaintiff of their expectations. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 14; Mayte Dep. at 59:22-60:13.) Vitale testified that Plaintiff brought a portfolio with him to the interview that included lesson plans from his elementary school classes; she had believed the lesson plans were "very vague" and not "up to par" for middle school standards, but assumed they were likely appropriate for elementary school. (Excerpts from the Tr. of the Dep. of Donna Vitale ("Vitale Dep. Excerpts") (Stockman Decl., Ex. F (Dkt. 53-6)) at 11:8-12:24.) Vitale further testified that although she would have expected Plaintiff to have presented a sample middle school lesson plan, and he did not, she recommended to Terry that Plaintiff be hired. (Id. at 12:6-7, 13:4-21.)

Terry hired Plaintiff to be a drama teacher at I.S. 230 for the 2010-2011 school year. (Defs.' 56.1 ¶ 16; Pl.'s 56.1 ¶ 16.) Plaintiff would have preferred to remain as the P.S. 224 theatre teacher; he asked Principal Andrews if there was any way that he could continue working at P.S. 224, but Andrews explained that Plaintiff could not remain if he was offered another position due to his excess status. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.)

2.     The Start of the 2010-2011 School Year

Plaintiff attended an orientation at I.S. 230, which included a review of school policies. (Defs.' 56.1 ¶¶ 18-19; Pl.'s 56.1 ¶¶ 18-19.) Plaintiff signed a certificate acknowledging receipt of the I.S. 230 Faculty Handbook. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Principal Terry met with Plaintiff several times near the start of the school year, to express her expectations and to discuss Plaintiff's goals. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)

4

At I.S. 230, Plaintiff taught five classes per day, to children in sixth, seventh, and eighth grades, including special education students who required adjusted lesson-planning and adjusted curricula. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) Assistant Principal Donna Vitale was Plaintiff's main supervisor at I.S. 230. (Mayte Dep. at 64:8-10.) Plaintiff generally believed that Vitale was a fair person and a fair supervisor. (Id. at 64:11-14.) Vitale evaluated Plaintiff's job performance over the course of the year; Plaintiff felt that the first of Vitale's evaluations were fair, but that certain subsequent evaluations by Vitale were not fair. (Id. at 64:15-21.)

### 3. First Formal Evaluation: Plaintiff's November 5, 2010, Lesson

Assistant Principal Vitale conducted the first formal evaluation of Plaintiff at I.S. 230 on November 5, 2010. (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) Vitale and Plaintiff had met the previous day, November 4, 2010, for a pre-observation meeting. (Defs.' 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.) On November 10, 2010, Plaintiff and Vitale met for a post-observation meeting. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.)

Vitale drafted a Formal Observation Report regarding the observed lesson. (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) The report described a lesson in which Plaintiff actively coached students in the performance of "freeze"-style improvisation scenes. (See Asst. Principal Vitale's Formal Observation Report of Nov. 5, 2010 ("Nov. 5, 2010, Formal Obs. Rep.") (Stockman Decl., Ex. I (Dkt. 53-9)) at 1.) The report rated the lesson "satisfactory." (Id. at 2.) The report made several recommendations, including that Plaintiff: (1) write the learning objective on the board at the beginning of each class; (2) create a "glows" and "grows" chart in which the student audience members would review their peers' performances and record suggestions, to be shared with the class at the conclusion of each lesson; and (3) record in a datafolio Plaintiff's conversations with

5

students regarding his evaluation of their performances. (Id. at 1-2.) The report also commended Plaintiff's modeling and coaching. (Id. at 2.)

On November 24, 2010, Plaintiff received a written copy of the November 5, 2010, Formal Observation Report. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) Plaintiff testified at his deposition that he took note of the suggestions documented in the report; he "started . . . conferencing data as students were performing," and "made sure that lesson objectives were written on the board." (Matye Dep. at 68:8-13.) He testified that "overall[, he] agree[d] with the suggestions and the observation." (Id. at 68:14-15.) However, he did not implement Vitale's recommendation that he create a "glows" and "grows" chart. (See id. at 68:11-13.)

4.    Interactions with Principal Terry: November and December 2010

In November of 2010, Principal Terry requested that Plaintiff create a theater atmosphere or feel in his classroom. (Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81.) She wanted the room to look like a theater; she suggested that Plaintiff install curtains and possibly ropes. (Matye Dep. at 99:13-100:4.) Plaintiff testified that he subsequently mentioned to Terry, in passing, that he did not think curtains were a good idea, and that she said "okay." (Id. at 100:7-101:9.)

In December 2010, Plaintiff met with Terry in her office, after she had observed one of his classes, and she gave him "some tips." (Defs.' 56.1 ¶ 83; Pl.'s 56.1 ¶ 83; Matye Dep. at 145:10-15.) Terry did not do any write-up of this observation. (Matye Dep. at 145:11-13.) Plaintiff testified that Terry had observed an improvisation class, and she said that the class was "satisfactory." (Id. at 176:21-177:7.)

During the December 2010 meeting, Plaintiff told Terry that he was going to have a baby, that his wife's due date was March 18, 2011, and that he was planning to take two weeks (ten school days) of paid sick leave whenever the baby was born. (See Defs.' 56.1 ¶ 84;

Pl.'s 56.1 ¶ 84; Matye Dep. at 145:8-15, 149:18-21, 150:17-21, 177:7-14.) Plaintiff testified that in response, Terry asked, "You're not taking more than two weeks, are you?" (Matye Dep. at 177:9-12.) Plaintiff also testified that he felt like Terry was warning that he "better not take more than that," but because he was not intending to take more than two weeks off at that time, "it was no big deal." (Id. at 177:15-178:6; see also Defs.' 56.1 ¶ 86; Pl.'s 56.1 ¶ 86.)

### 5. Informal Observation: January or February 2011

On one occasion in January or February 2011, Assistant Principal Thomas informally observed one of Plaintiff's classes. (Matye Dep. at 127:9-128:25.) It was a class with a number of behavioral issues, and the students were acting "off the wall" while Plaintiff taught the lesson. (Id. at 128:4-8.) Thomas had noticed the students' behavior while walking by the classroom; she entered Plaintiff's classroom and watched for a while, and then gave Plaintiff suggestions for dealing with this particular group of students. (Id. at 128:4-15.) Plaintiff testified that he implemented Thomas's recommendations, and "relations with [the] group improved." (Id. at 128:9-17.)

### 6. Second Formal Evaluation: Plaintiff's February 4, 2011, Lesson

Assistant Principal Vitale conducted a second formal evaluation of Plaintiff on February 4, 2011. (Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) Vitale and Plaintiff met for a pre-observation meeting on February 1, 2011. (Defs.' 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.) On February 11, 2011, Plaintiff and Vitale met for a post-observation meeting. (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.)

Vitale wrote a Formal Observation Report regarding the observed lesson. (Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) The report discussed a lesson in which Plaintiff provided instruction to students as they performed monologues. (See Asst. Principal Vitale's Formal Observation Report of Feb. 4, 2011 ("Feb. 4, 2011, Formal Obs. Rep.") (Stockman Decl., Ex. J (Dkt. 53-10))

at 1).) The report rated the lesson "satisfactory." (See id. at 2.) The report included several recommendations, including that Plaintiff: (1) have the student audience members share their critiques before Plaintiff states his own observations, to avoid chilling student participation; (2) add an interactive "word wall" to his classroom, "contain[ing] key vocabulary words/phrases that are used within this unit"; and (3) post "sentence stems around the room for students to use in their critiques." (Id. at 1-2.) The report also directed Plaintiff to "create the look and feel of a theater in [the] classroom" and to "post authentic student work and artifacts . . . on all of the walls and closet doors" by a date certain, March 16; to see Vitale "ASAP" if this required monetary assistance; and to meet with Vitale at the beginning of fourth period on March 10, to discuss Plaintiff's "plans to improve the learning environment." (Id. at 2.) The report further commended Plaintiff for the use of a clear critique rubric. (Id.)

On March 11, 2011, Plaintiff received a written copy of the February 4, 2011, Formal Observation Report. (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.) At his deposition, Plaintiff testified that the report accurately described the substance of the class and how the class had proceeded. (Matye Dep. at 71:16-72:4.) Plaintiff recalled that Vitale had instructed him at the February 11, 2011, post-observation meeting to add an interactive word wall to his classroom; he testified that he was not sure what that meant, and that Vitale had stated that they would discuss it further at a subsequent meeting. (Id. at 72:9-17, 74:1-6.) However, the subsequent meeting never occurred, and Plaintiff did not implement the word wall, because he did not want to do it incorrectly. (Id. at 72:14-20.) Plaintiff testified that at some point he asked Vitale if they were going to have a follow-up meeting, and they were supposed to meet in mid-March, but it "ended up not happening." (Id. at 72:21-73:14.) Plaintiff also testified that he did not implement the recommendation to post sentence stems because he forgot about it. (Id. at 74:10-14.) Plaintiff

8

testified that he did post written student work and photographs of student performances both in the classroom and on a bulletin board outside the classroom. (Id. at 74:22-75:10.)

### 7. March 3, 2011, Incidents

Three separate incidents involving students under Plaintiff's supervision occurred on March 3, 2011. Plaintiff argues that each of these incidents was "treated as innocuous at the time . . . , and later transformed by [D]efendants into negative performance issues."[2] (Aff. of Robert Matye ("Matye Aff.") (Lefkowitz Affirmation, Attach. 1 (Dkt. 55-1)) ¶ 30.)

#### a. Closet Door Incident

First, during the few minutes between class periods, Plaintiff was standing by the door to his classroom in order to receive students as they arrived, when a student ran into the classroom, yelling that his friend was chasing him. (Matye Dep. at 109:1-17.) The student opened a closet door and partially closed the door on himself, hiding behind the door in an attempt to surprise or scare his friend. (Id. at 109:13-25.) The student could not close the door all the way, because the closet was full of shelving. (Id. at 109:18-20.) Plaintiff told the student to sit down, but he did not do so. (Id. at 110:1-8; see also Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.) The second student ran in, almost immediately after the first, still chasing the first student, and the two students grappled with the door, ultimately ripping the door off its hinges. (Matye Dep. at 110:1-14.) At that point, Plaintiff was able to get the students to sit down. (Id. at 110:14-15; Matye Aff. ¶ 32.) Ultimately, property was damaged, but no one was injured. (See Matye Aff. ¶ 32; Matye Dep. at 107:14-16.)

Plaintiff called Assistant Principal Vitale, Dean Daniel Espinal, and a school safety

---

[2] The court treats this statement, contained in Plaintiff's affidavit, as argument, not evidence. The statement is self-serving and conclusory, and does not specify the factual basis for Plaintiff's belief. Cf. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations . . . , absent any concrete particulars, would necessitate a trial in all [discrimination/retaliation] cases.").

officer to the classroom and explained what had occurred. (Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 45; Matye Dep. at 110:15-18.) Plaintiff testified that the administrators took the students away, and were gone within a few minutes. (Matye Dep. at 110:19-20.) Plaintiff also testified that he had had problems with these two students in the past. (Matye Dep. at 115:18-116:6.) They had behavioral issues and were known to roughhouse. (Id.) They would speak in an insubordinate manner; they would get out of their chairs and move around; they would be late to class; they would leave the classroom without permission; they would fight in the hallway and cafeteria.[3] (Id.) One of the deans, and Plaintiff's union representative, Dean Peter Bloch, swore in an affidavit that these two students were "notorious [for] behavior issues at the school." (Aff. of Peter Bloch ("Bloch Aff.") (Lefkowitz Affirmation, Ex. B (Dkt. 55-3)) ¶ 9.)

Dean Espinal, who was responsible for the investigation into the incident, created an Occurrence Report based on the findings of his investigation. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) The Occurrence Report described the incident as one student "playing inside the closet" and another student "outside holding the closet door when the door was broken." (Dean Espinal's Occurrence Report of March 3, 2011 ("Mar. 3, 2011, Espinal Occurrence Rep.") (Stockman Decl., Ex. L (Dkt. 53-12)).) It notes that the students' parents were notified, and that four-day suspensions were authorized after parent conferences. (See id.)

### b.    Floor Incident

On the same date, Assistant Principal Ronald Zirin observed two additional incidents involving students under Plaintiff's supervision. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.)  First,

---

[3] The court discounts a statement contained in Plaintiff's affidavit submitted in opposition to this motion, in which Plaintiff writes that "[the students] were known for having behavior issues, and it happened so fast that at the time everyone agreed that I had done nothing wrong and there was no issue with my classroom management skills." (Matye Aff. ¶ 33.) Plaintiff's statement that "everyone agreed that [he] had done nothing wrong and there was no issue with [his] classroom management skills" is conclusory and self-serving. Plaintiff does not specify any factual basis for this belief. Cf. Meiri, 759 F.2d at 998.

10

during eighth period, having heard that a student was in the nurse's office after striking her head on the floor during Plaintiff's class, Zirin opened the door to Plaintiff's classroom to investigate what had occurred, and he observed several students lying on the floor, in front of the door. (Tr. of the Dep. of Ronald Zirin ("Zirin Dep.") (Lefkowitz Affirmation, Ex. H (Dkt. 55-9)) at 38:5-21; Matye Dep. at 76:18-21.) During his deposition, Zirin described the students as engaged in some physical contact with each other, looking like they were wrestling. (Id. at 38:20-39:15; see also Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Plaintiff disputes that there was any physical contact between the students. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) According to Plaintiff, three or four students were on the floor, grabbing the backs of their heads, and yelling, "Oh, my head," when Zirin entered the classroom. (Matye Dep. at 76:18-21, 81:24-82:23.) They were imitating the student who had gone to the nurse's office, who fell and hit her head while running during class. (Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.) Plaintiff told Zirin that the students did not have his permission to be on the floor. (Defs.' 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)

### c. Auditorium Incident

Second, after school that same day, Zirin observed through the windows of the closed auditorium doors students running up and down the auditorium aisle. (Zirin Dep. at 45:5-10.) Plaintiff was conducting an after-school rehearsal in the auditorium, and at some point, Plaintiff gave them a five-minute break from rehearsal. (Matye Dep. at 85:1-24, 88:13-16.) During the break, some of the students were playing hide-and-seek, and were running in the auditorium. (Defs.' 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.) Zirin entered the auditorium. (Matye Dep. at 87:22-88:11; Zirin Dep. at 45:12-46:2.) Zirin testified that he stopped the children from running, but he did not specifically discuss the running with Plaintiff at that time, in front of the students. (Zirin Dep. at 46:4-15.) Plaintiff contends that Zirin did not tell him to have the students stop running.

11

(Matye Aff. ¶ 38.) It is undisputed that Zirin told Plaintiff to be "careful" and then left the auditorium. (See Matye Dep. at 88:15-16; Zirin Dep. at 46:7-8.) Plaintiff interpreted this to mean he should "[m]ake sure the students weren't going fast or in any sort of danger," but that he should "keep doing what I was doing." (Matye Dep. at 88:19-24.)

### 8. Informal Observation: March 9, 2011

On March 9, 2011, Principal Terry informally observed one of Plaintiff's classes. (Defs.' 56.1 ¶ 70; Pl.'s 56.1 ¶ 70.) The class Terry observed usually contained twelve students; however, that day, only three or four students were present in the classroom because it was a class of special education students, a number of whom had been pulled out of the class for services. (Matye Dep. at 89:22-90:6; Matye Aff. ¶ 26.) Plaintiff had finished a unit and was about to start a new unit, but because so many students were absent, he "off-the-cuff" decided to present an alternate lesson. (Matye Dep. at 90:7-18.)

Terry asked Plaintiff he had a lesson plan; he responded that he did not have a lesson plan for the lesson that he was teaching. He explained that he did have a "detailed lesson plan" but that due to low attendance he did not want to proceed with the new lesson, and decided instead to show a movie. (Matye Dep. at 90:20-25; see also Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73.) Plaintiff asked Terry if she would like to see the lesson plan that he had prepared, i.e., for the lesson he did not teach that day; she declined and left the classroom after only a few minutes. (Defs.' 56.1 ¶ 74; Pl.'s 56.1 ¶ 74; Matye Dep. at 91:4-11.) Plaintiff did not write the purpose of the lesson on the board that day; he testified that this was because of the "impromptu change in the lesson plan." (Matye Dep. at 92:7-25.)

The following day, March 10, 2011, Plaintiff met with Terry regarding the class. (Matye Dep. at 94:2-95:4.) Terry told Plaintiff that she believed the lesson had been "unsatisfactory," because there was no lesson; all Plaintiff had done was show a movie.[4] (Id. at 94:24-95:4.)

Terry wrote an Informal Observation Report regarding the observed lesson; the report made a number of recommendations. (See Principal Terry's Informal Observation Report of Mar. 9, 2011 ("Mar. 9, 2011, Informal Obs. Rep.") (Stockman Decl., Ex. R (Dkt. 53-18)).) Plaintiff did not receive a copy of the March 9, 2011, Informal Observation Report until April 13, 2011. (See id.)

> 9. Plaintiff's Ten Days of Sick Leave After the Birth of his Child and Subsequent Return

In early March, Plaintiff reminded Vitale of the anticipated birth of his child and his anticipated ten days' sick leave for the final time prior to the birth and leave. (See Defs.' 56.1 ¶ 87; Pl.'s 56.1 ¶ 87.) He did not remind Terry directly that he would be taking sick leave; the December 2010 meeting was the only time prior to his child's birth that he communicated to Terry that he would be taking ten days off. (Matye Dep. at 149:18-151:10.) Plaintiff testified that this was because he thought that Terry would remember, and he dealt primarily with Vitale in his day-to-day activities; he did not see Terry on a regular basis. (Id.) Plaintiff took paid sick leave from March 15, 2011, the date of his child's birth, through March 28, 2011. (Defs.' 56.1 ¶ 89; Pl.'s 56.1 ¶ 89.)

On March 16, 2011, Plaintiff received an email and phone call from the school's payroll secretary. (Matye Dep. at 148:25-149:8.) Plaintiff returned the phone call, and the payroll secretary transferred the call to Terry. (Id. at 149:8-9.) Terry, who was unaware that Plaintiff's

---

[4] In a declaration submitted in support of this motion, Terry asserts that she told Plaintiff that he was in danger of not fulfilling his probationary requirement unless his teaching improved. (Decl. of I.S. 230 Principal Sharon Terry ("Terry Decl.") (Stockman Decl., Ex. H (Dkt. 53-8)) ¶ 7.) Plaintiff appears to contend that she did not make this statement at the post-observational meeting. (Compare Defs.' 56.1 ¶ 78, with Pl.'s 56.1 ¶ 78; see also Matye Dep. at 94:2-95:18.)

child had been born, asked Plaintiff why he was not at work. (See id.) It appears that prior to that phone call, Plaintiff had not let anyone at the school know that the child had in fact been born and that his ten days of sick leave had begun. (See id. at 149:5-151:10; Tr. of the Dep. of Donna Vitale ("Vitale Dep.") (Lefkowitz Affirmation, Ex. G (Dkt. 55-8)) at 33:20-25.) Plaintiff alleges that during this conversation, Terry stated that it would reflect poorly on Plaintiff's end-of-year review if he took any more than ten days off. (Matye Dep. at 149:10-17.) Plaintiff understood this to mean that he might get an unsatisfactory rating for the year, which he believed would result in his probation being extended and the denial of tenure, but he did not believe that his employment would be terminated. (Defs.' 56.1 ¶ 92; Pl.'s 56.1 ¶ 92; Matye Dep. at 152:1-18.) Plaintiff told Terry during the March 16 phone call that he was not planning to take more than ten days off. (Defs.' 56.1 ¶ 93; Pl.'s 56.1 ¶ 93.)

Subsequently, upon reflection with his wife, Plaintiff decided to take additional unpaid leave pursuant to the FMLA. (Defs.' 56.1 ¶ 94; Pl.'s 56.1 ¶ 94.) On March 27, 2011, while Plaintiff was nearing the end of his sick leave, Plaintiff emailed Terry to request FMLA leave beginning on April 27, 2011. (See Defs.' 56.1 ¶¶ 94-95; Pl.'s 56.1 ¶¶ 94-95; Matye Dep. at 148:18-24.) Terry referred Plaintiff to the payroll secretary to process the FMLA request. (Defs.' 56.1 ¶ 96; Pl.'s 56.1 ¶ 96.)

Plaintiff returned to work on March 29, 2011. (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.) Terry greeted Plaintiff upon his return; this was Plaintiff's first direct contact with Terry after the March 16, 2011, phone call. (Defs.' 56.1 ¶ 100; Pl.'s 56.1 ¶ 100.) Plaintiff met with the payroll secretary, who provided Plaintiff with FMLA leave paperwork as well as additional paperwork for a different type of leave that Plaintiff was not seeking. (Matye Dep. at 143:1-144:4.) Plaintiff turned in both sets of paperwork; later, Assistant Principal Zirin helped Plaintiff retrieve

the non-FMLA paperwork from the payroll secretary. (Matye Dep. at 143:1-15, 146:3-14.) Ultimately, the payroll secretary submitted Plaintiff's FMLA leave paperwork, and the request for leave was approved. (Defs.' 56.1 ¶ 98; Pl.'s 56.1 ¶ 98.)

Plaintiff worked from March 29, 2011, through April 15, 2011, which was the beginning of spring break. (Defs.' 56.1 ¶ 101; Pl.'s 56.1 ¶ 101.) Plaintiff then took FMLA leave from April 27, 2011, which was the end of spring break, through the end of the school year. (See Defs.' 56.1 ¶ 103; Pl.'s 56.1 ¶ 103.) Accordingly, Plaintiff was out on FMLA leave for the last two months of his DOE probationary period. (Defs.' 56.1 ¶ 104; Pl.'s 56.1 ¶ 104.) From March 29, 2011, until Plaintiff's last day of work on April 15, 2011, Plaintiff had no direct contact with Terry other than for "incidental stuff." (Defs.' 56.1 ¶ 102; Pl.'s 56.1 ¶ 102.)

### 10. April 1, 2011, Meetings: Follow-up to March 3, 2011, Incidents

On April 1, 2011, Plaintiff attended two meetings regarding the three incidents that had each occurred on March 3, 2011, prior to Plaintiff's sick leave. First, Plaintiff met with Assistant Principal Vitale and Plaintiff's union delegate, Dean Peter Bloch, regarding the closet door incident. (Matye Dep. at 104:6-105:7, 105:18-106:16, 107:20-108:23.) Vitale gave Plaintiff an opportunity to explain what had occurred from his perspective. (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) Vitale then told Plaintiff that his explanation made sense and that it seemed like he had handled the situation well. (Matye Dep. at 111:13-17.) Vitale stated that she planned to recommend to Principal Terry that Plaintiff receive a warning to keep in mind classroom management techniques. (Id. at 111:13-112:5.) The meeting ended "on a friendly note, . . . with the determination that [Plaintiff] had done nothing wrong." (Bloch Aff. ¶ 10.)

Vitale later wrote a letter to Plaintiff, dated April 6, 2011, regarding the closet door incident and the April 1, 2011, follow-up meeting. (Apr. 6, 2011, Vitale Ltr. to Pl. (Stockman Decl., Ex. M (Dkt. 53-13)).) Plaintiff received the letter April 7, 2011. (Id.) The letter stated

15

that "[a]fter reviewing the situation and [Plaintiff's] explanation," Vitale "found that there was a lack of classroom management on March 3, 2011 when this event took place." (Id.) It further stated that Plaintiff "need[ed] to establish a set of classroom rituals and routines as to how the students enter [the] classroom and what is expected of them as they wait for the lesson to begin." (Id.) It warned that the incident "may lead to further disciplinary action including an unsatisfactory rating and termination of . . . employment." (Id.)

Plaintiff responded to Vitale's April 6, 2011, Letter, with a letter to his own file, dated April 12, 2011. (See Apr. 12, 2011, Pl. Ltr. to File re: Incident on March 3rd, Class 6TB, Period 3 (Stockman Decl., Ex. N (Dkt. 53-14)).) Plaintiff discussed the closet door incident, and defended his classroom procedures. (See id.) Plaintiff also noted that the "two students in question had a history of improper behavior" in Plaintiff's classroom, and that "[i]ncidents regarding both of them have happened several times over the past year." (Id.) Plaintiff noted that the students had exhibited "insubordination and disrespect," and that he did not believe classroom management was to blame. (Id.)

Second, Plaintiff met with Assistant Principal Zirin and Dean Bloch, regarding the other two March 3, 2011, incidents—the floor incident and the auditorium incident. (Matye Dep. at 76:12-21, 104:6-105:1, 106:1-16.) Zirin also wrote a letter to Plaintiff, dated April 7, 2011, memorializing the meeting and discussing the incidents. (Apr. 7, 2011, Zirin Ltr. to Pl. (Stockman Decl., Ex. P (Dkt. 53-13)).) Plaintiff received this letter April 11, 2011. (See id.) With respect to the floor incident, the letter stated that Zirin had observed students on the floor who appeared to be wrestling, but also noted that Plaintiff had stated that the students were not wrestling, and that they were mimicking the behavior of the student who had been injured. (See id.) The letter stated that Plaintiff had "exhibited ineffective pupil guidance, control of

class, and unsatisfactory attention to pupil health, safety and general welfare during [the] eighth period class, and in the afterschool activity in the auditorium." (Id.) Plaintiff was warned that he must "work towards developing more effective classroom management strategies," and, apparently referring to the after-school rehearsal in the auditorium, that "'[f]ree time' is not permitted, and [is] a violation of school policy." (Id.) The letter further stated that the "incident may lead to further disciplinary action including an unsatisfactory rating and termination of employment." (Id.)

At his deposition, Plaintiff testified that he did not agree with much of what was written in Zirin's letter; in particular, he felt that any concerns expressed in the letter regarding Plaintiff's classroom management skills were unwarranted, and the students on the floor during eighth period had not been wrestling.[5] (See Matye Dep. at 77:18-79:10.) Accordingly, Plaintiff did not adjust his approach to classroom management based on what was written in the letter. (Id. at 79:3-10.)

Plaintiff responded to Zirin's April 7, 2011, Letter, with a letter to his own file, dated April 12, 2011. (See Apr. 12, 2011, Pl. Ltr. to File re: Incidents on March 3rd, 8th Period 712 & After-School Rehearsal (Stockman Decl., Ex. Q (Dkt. 53-17)).) Plaintiff generally defended his conduct with respect to both incidents. (Id.) With respect to the eighth period class, he noted that the students "were writhing on the floor, mocking the student who had injured her head," and that he "directed them to their seats multiple times while [he] was on the phone with the nurse" but was disobeyed. (Id. at 1.) With respect to the after-school rehearsal, he explained that the rehearsal was scheduled for 90 minutes, and that it was customary to have a short break

---

[5] Specifically, Plaintiff testified that "none of [those] types of . . . physical activities of [his] students occurred." (Matye Dep. at 77:18-79:10.) The court interprets this to mean that the students had not been wrestling, as Plaintiff agrees that students were in fact running in the auditorium during the after-school rehearsal. (See Defs.' 56.1 ¶ 61; Pl.'s 56.1 ¶ 61; Matye Aff. ¶ 38; Matye Dep. at 88:19-24.)

during which time students could use the restroom, read, physically warm-up, and/or prepare for the next phase of rehearsal. (Id.) He also wrote that "hide-and-seek" was a traditional and appropriate activity, "as it helps students to warm-up physically, create connections with other cast members, and increase their kinesthetic awareness." (Id.) He further noted that the rehearsal had been conducted "on a volunteer basis" and "during [Plaintiff's] personal time." (Id.) Accordingly, he stated, "[t]here was no 'lesson,' and there is no 'bell-to-bell schedule,' as this was after-school on a volunteer basis." (Id. at 2.)

11.     Informal Observation: April 6, 2011

On April 6, 2011, Vitale conducted an informal observation of Plaintiff's class. (Defs.' 56.1 ¶ 105; Pl.'s 56.1 ¶ 105.) Vitale wrote an Informal Observation Report regarding the observed lesson. (Defs.' 56.1 ¶ 106; Pl.'s 56.1 ¶ 106.)

The report described a lesson "about the structure of 'West Side Story' compare[d] to 'Romeo & Juliet' in relationship to music and dance." (Assistant Principal Vitale's Informal Observation Report of Apr. 6, 2011 ("Apr. 6, 2011, Informal Obs. Rep.") (Stockman Decl., Ex. T (Dkt. 53-20)) at 1.) The report stated that Plaintiff played the movie West Side Story on the SMART board, and paused the movie at various times to ask questions of the class. (See id. at 1.) It further stated that only 16 out of the 34 students in the class "had the question sheet, a piece of paper or a pen on the desk as [Plaintiff] was reviewing the questions." (Id.) It also noted that Plaintiff asked the class to stop talking and pay attention several times, and that "[m]any of the students were whispering loudly." (Id.) In his deposition, Plaintiff agreed that the description of the lesson was accurate. (See Matye Dep. at 117:4-25.)

The report also made several recommendations, including that Plaintiff: (1) add an interactive word wall to his classroom, and noted that this recommendation had been given in a

18

prior observation, but had not been implemented; (2) post sentence stems around the room, and noted that this recommendation had been given in a prior observation, but had not been implemented; (3) post the learning objective on the board; and (4) ensure that students remain on task throughout the class. (See Apr. 6, 2011, Informal Obs. Rep. at 1-2.) The report commended Plaintiff for publicly praising a student for being on task. (Id. at 2.) Overall, the report rated the lesson "unsatisfactory." (Id.)

As discussed above, supra Part I.A.6, Plaintiff testified at his deposition that he did not implement the recommendation to post sentence stems because he forgot about it; and he testified that he did not create a word wall because the follow-up meeting with Vitale ended up not happening, and he did not want to do it incorrectly. (See Matye Dep. at 72:14-73:14, 74:10-14, 118:5-10.) Plaintiff also testified that he had posted the day's lesson objective on the SMART board prior to the start of the movie. (Id. at 117:11-13.) Defendants note that if this occurred, the lesson objective would not have remained on the SMART board once the film began, and thus it was not posted when Assistant Principal Vitale entered Plaintiff's classroom on April 6, 2011. (See Defs.' 56.1 ¶ 112 (citing Matye Dep. at 124:12-16).)

Plaintiff received a written copy of the April 6, 2011, Informal Observation Report on April 14, 2011. (Defs.' 56.1 ¶ 106; Pl.'s 56.1 ¶ 106.) In response, Plaintiff wrote a letter to his own file, dated April 14, 2011. (See Apr. 14, 2011, Pl. Ltr. to File re: Informal Observation Letter Received on Apr. 14, 2011 (Stockman Decl., Ex. U (Dkt. 53-21)).) The letter stated, inter alia, that "[s]ome students either lost or refused to work on their work sheet," but also noted that the "priority of the lesson was the classroom discussion; the work sheet served only as a supplement." (Id.) The letter also addressed the recommendations. It explained that Plaintiff "did not put the objective on the board, because [he] felt that it was a recommendation and not a

requirement." (Id.) The letter further explained that Plaintiff did not receive a copy of the recommendations from his February observation until the second week of March, and because Plaintiff was out for the second half of the month of March, he had "less than one week to implement the recommendation." (Id.) It also stated that Plaintiff had no "formal training in literacy," and "did not know what 'word stems' were before this recommendation." (Id.)

### 12. Informal Observation: April 13, 2011

On April 13, 2011, Assistant Principal Zirin entered Plaintiff's classroom.[6] (See Defs.' 56.1 ¶ 117; Pl.'s 56.1 ¶ 117; Zirin Dep. at 56:10-22.) Plaintiff's students were misbehaving, yelling, and goofing off. (Defs.' 56.1 ¶ 119; Pl.'s 56.1 ¶ 119.) Plaintiff yelled at his students, including stating:

- "Guys, you have to deal with me for two more days, let's get it over with!"

- "In a chair now!"

- "I need silence now!"

- "Excuse me, I am going to show you the ending, then you are going to take a test!"

- "You know what; I have had enough trouble with this class."

- "[Y]ou need to sit down!"

- "Today is the day I will request suspensions, I went to a suspension hearing today!"

(Defs.' 56.1 ¶ 120; Pl.'s 56.1 ¶ 120.)

The class that Zirin observed involved the same lesson, with the same structure, as the class that Vitale had observed the prior week, on April 6, 2011, watching the movie West Side

---

[6] Zirin testified that he entered the classroom because he heard Plaintiff "yelling at his students and threatening them with suspension and making statements such as, 'I'll be leaving in a couple of days,' 'you have to put up with me,' and other statements to that effect," while he was walking through the halls in his ordinary practice. (Zirin Dep. at 56:10-22; see also Defs.' 56.1 ¶ 117.) Plaintiff objected to being asked "to confirm what was going through Zirin's mind which 'caused' Zirin to enter [the] classroom." (See Defs.' 56.1 ¶ 117; Pl.'s 56.1 ¶ 117.)

Story and comparing it to Romeo and Juliet. (See Defs.' 56.1 ¶¶ 118, 126; Pl.'s 56.1 ¶¶ 118, 126.) Plaintiff had created a single lesson plan that covered the approximately sixteen-to-twenty class periods that he was responsible for teaching between April 5, 2011, and April 13, 2011. (Defs.' 56.1 ¶¶ 126-127; Pl.'s 56.1 ¶¶ 126-127.)

Zirin drafted an Informal Observation Report, dated April 15, 2011, regarding the observed lesson. (See Assistant Principal Zirin's Informal Observation Report of Apr. 15, 2011 ("Apr. 15, 2011, Informal Obs. Rep.") (Stockman Decl., Ex. X (Dkt. 53-24)).) Zirin's report noted each of the above-quoted statements made by Plaintiff to his students; stated that when Zirin entered the room the lights were off, students were yelling at each other, two students were out of their seats, and one student was leaning his desk backwards; and stated that Plaintiff had been required to "yell at the class several times to address poor student behavior and off task activity." (Id. at 1.) The report explained that "threats, warnings and punishments are not effective in creating a high engagement classroom" and instead recommended that Plaintiff "[f]acilitate a positive environment" and "make the improvement of the classroom learning environment a priority in order to effectively engage . . . students." (Id. at 1-2.) It further noted that a learning objective was not posted during the lesson; "instead, 'Fat Joey' and a student drawing was written on the board." (Id. at 1) Zirin also wrote that the use of the same lesson plan for "different grades, age groups, emotional and social maturity levels, varied English language ability and special needs students" was "not an effective strategy to lead to high levels of engagement and work product, as evidenced during the lesson," and that Plaintiff was expected to prepare individual lesson plans for each lesson, to "take into account the varied needs of [his] students." (Id. at 2.) The report rated the lesson "unsatisfactory." (Id.)

21

Plaintiff testified that he had posted the lesson objective on the SMART board that day prior to showing the movie, and that he believed his class instruction had been satisfactory, because the students had eventually gotten on task and discussed the movie, and then took a quiz. (Matye Dep. at 125:21-23, 129:18-130:4.) Plaintiff also testified that it had taken him twenty minutes to prepare the West Side Story lesson plan, which was approximately half as long as it would have taken him to prepare a typical lesson plan. (Matye Dep. at 138:7-25.)

### 13.    Plaintiff's Receipt of March 9, 2011, Informal Observation Report

Also on April 13, 2011, Plaintiff received a copy of the March 9, 2011, Informal Observation Report written by Principal Terry, regarding the class she had observed prior to Plaintiff's sick leave. (See Mar. 9, 2011, Informal Obs. Rep.) The report noted that Plaintiff had been "unable to provide [Terry] with a lesson plan," and explained that "[i]t is imperative that [Plaintiff] have a clearly defined and well thought out plan for every instructional period including half days, test days and days before holidays." (Id. ¶ 1.) The report further noted that the students, who were "passively watching the movie, 'Cat on a Hot Tin Roof' for the entire period, . . . seemed to be unaware of the purpose of the lesson," and noted that the lesson objective was not written on the board. (Id. ¶ 3.) The report also explained that a lesson for a special education class "must be designed to promote subject matter knowledge and language development for students with special needs," and watching a movie "with no directions, focus, or guiding questions does not promote learning." (Id. ¶ 2.) The report further noted that Terry had spoken to Plaintiff in November and requested that he decorate the room, and that Plaintiff had also been asked in Vitale's February 4, 2011, Formal Observation Report to "create a theater feel in [the] room using various artifacts"; it suggested that Plaintiff's room had not yet been decorated and asked that he "[p]lease begin to decorate the room with artifacts that reflect the

22

dramatic experience" and "make sure to meet with Donna Vitale to make sure" the room is decorated "according to the date in the observation of 2/4." (Id. ¶ 4.)

In response to the written report, Plaintiff wrote a letter dated April 13, 2011, to his own file. (See Apr. 13, 2011, Pl. Ltr. to File re: Informal Observation Letter Received Apr. 13, 2011 ("Apr. 13, 2011, Pl. Ltr. to File") (Stockman Decl., Ex. S (Dkt. 53-19)).) Plaintiff contended that "the accusation that students were 'passively watching' the motion picture Cat on a Hot Tin Roof during the entire period . . . cannot be further from the truth." (Id. at 1.) He wrote that the film was paused several times during the class for classroom discussion, including critique and analysis of acting performance, plot, and writing. (Id.) The letter acknowledged that Plaintiff did not have a lesson plan for the particular activity, and explained that he did have a prepared lesson plan for a lesson he ultimately chose not to teach due to poor attendance. (Id.) Plaintiff also noted that because Terry had only been in the class for a few minutes, she did not observe any of the class discussion, and could not have known what occurred "the entire period"; he further wrote that "[e]ven though [Terry] insists that students did not know the purpose of the lesson, no student was asked in [Plaintiff's] presence." (Id. at 1-2.) Finally, he acknowledged that "there was a request . . . to give a 'theater feel' to the room by decorating the room with artifacts," but that "[a]s a working theater professional, [he] disagree[s,] and ignored the request." (Id. at 1.) Plaintiff explained that a "proper theater room . . . is traditionally empty because an empty room allows for greater range of motion," and reiterated that "this was a request which [he] did not agree with." (Id.)

Plaintiff testified that before receiving Terry's March 9, 2011, Informal Observation Report, his relationship with Terry was "cordial, professional, fine." (Matye Dep. at 101:25-2.) The only prior "perceived problem" or problems he could recount were the December 2010

23

conversation with Terry, in which she cautioned him not to take more than ten days off upon the birth of his child; and the March 16, 2011, phone call with Terry, at the start of his sick leave, when she stated that it would reflect poorly on Plaintiff's end-of-year review if he took any more than ten days off. (Id. at 102:3-24; see also supra Parts I.A.4, I.A.9.)

### 14. Plaintiff's Departure from I.S. 230 and Termination

As noted above, Plaintiff took FMLA leave from April 27, 2011, through the end of the school year. (See Defs.' 56.1 ¶ 123; Pl.'s 56.1 ¶ 123.) Plaintiff understood that, as of April 15, 2011, the beginning of spring break, he would not be actively teaching at I.S. 230 for the remainder of the school year, his final year of probationary employment. (Defs.' 56.1 ¶ 124; Pl.'s 56.1 ¶ 124.) Near the end of Plaintiff's time at I.S. 230, he was considering whether he might be able to transfer to a different school for the following year. (See Matye Dep. at 152:19-153:2.) At the time he left on FMLA leave, he did not consider whether he might not have established a sufficient teaching record to continue his employment with the DOE. (Id. at 153:24-154:10.) Plaintiff testified that it was his belief that the negative paperwork in his file had been placed there intentionally because Principal Terry was angry with him for taking FMLA leave. (Id.)

Plaintiff testified that Assistant Principal Zirin did not make any negative statements to Plaintiff regarding taking FMLA leave. (Id. at 167:25-168:16.) He testified that Assistant Principal Vitale had made one statement, which Plaintiff believed to be innocent at the time, but later thought to be negative, regarding his FMLA leave; specifically, after Plaintiff's return from sick leave, he apologized to Vitale for having to leave again, and she responded that he should not feel bad, because "sometimes you have to put your family before your career." (Id.) Plaintiff did not think anything of this at the time, but in retrospect, he believed this indicated

something negative about his taking FMLA leave; he wondered why his career would be in jeopardy. (See id.)

On Plaintiff's final day at I.S. 230, April 15, 2011, he met with Principal Terry. (Matye Dep. at 161:24-162:12; Mar. 25, 2011, Terry Email re: Tenure Criteria (Lefkowitz Affirmation, Ex. W (Dkt. 55-24)).) The meeting had been scheduled while Plaintiff was out on sick leave, and the original intention was that the probationary teacher would produce a packet of work and explain why he or she believed tenure was appropriate; and the principal would discuss expectations and the like. (Matye Dep. at 162:3-21.) Plaintiff brought a packet of materials, including a DVD of student performances, and attempted to show them to Terry. (Id. at 162:20-163:8.) Plaintiff asked Terry to please watch the DVD whenever she had time so that she could observe his students' progress. (Id. at 163:10-14.) Terry stopped Plaintiff, and stated that "because of the incidences that have happened and because you can't even complete the school year, . . . I'm not going to grant you tenure, I'm going to deny you tenure outright."[7] (Id. at 163:14-15, 163:20-164:4.)

Two of Plaintiff's former students submitted affidavits discussing events that occurred after Plaintiff's final day at I.S. 230. One student, J.S., stated that Terry came to his class and announced that Plaintiff would no longer be his teacher. (J.S. Aff. (Stockman Decl., Ex. X (Dkt. 53-24)) ¶ 6.) J.S. also stated that some students had passed around a petition to try to bring Plaintiff back to the school, and that he had liked Plaintiff "very much and considered him to be one of [his] favorite teachers." (Id. ¶ 8.) Another student, A.T., stated in an affidavit that Terry

---

[7] Plaintiff's affidavit claims that Terry "stated . . . in no uncertain terms that she was giving [him] an unsatisfactory review and recommending to deny [him] tenure because [he] was not completing the school year and because it meant that [they] had to cancel the play." (Matye Aff. ¶ 48.) Defendants are correct that this is contradicted by Plaintiff's deposition testimony, in which he was not sure whether Terry mentioned the play or not. (See Matye Dep. at 164:1-3.) The court accepts as true Plaintiff's deposition testimony, not the contradictory statements in his affidavit.

held an assembly in the school auditorium for drama students, and that Terry told the approximately 45 students in attendance "that Mr. Matye was 'irresponsible' and that he 'quit.'" (A.T. Aff. (Stockman Decl., Ex. Y (Dkt. 53-25)) ¶¶ 10-11.) A.T. was deposed in this case, and she testified consistently in her deposition, stating that Terry's "exact words" were "that Mr. Matye was irresponsible and that he quit."[8] (Tr. of the Dep. of A.T. ("A.T. Dep.") (Lefkowitz Affirmation, Ex. D (Dkt. 55-5)) at 7:15-8:5.) A.T. testified that the assembly was held after a petition asking to bring Plaintiff back to the school, or to get a replacement drama teacher, was placed in Terry's mailbox; at the assembly, Terry explained to the students that there would be no drama teacher going forward. (A.T. Dep. at 8:11-25, 12:6-22.)

At the close of the school year, on June 21, 2011, Terry completed Plaintiff's 2010-2011 Annual Professional Performance Review and Report on Probationary Service. (Defs.' 56.1 ¶ 142; Annual Prof'l Perf. Review for Robert Matye, School Year 2010-2011 ("2010-2011 Annual Review") (Stockman Decl., Ex. Z (Dkt. 53-26)).) Terry gave Plaintiff seven "satisfactory" and sixteen "unsatisfactory" ratings in specific categories,[9] and an overall rating of "unsatisfactory." (2010-2011 Annual Review.) Terry recommended denial of certification of

---

[8] In opposition to this motion, Plaintiff submitted printouts of instant message conversations that he had on Facebook with these two former students. (See J.S.-Pl. Facebook Instant Message Conversation (Lefkowitz Affirmation, Ex. J (Dkt. 55-11)); A.T.-Pl. Facebook Instant Message Conversation (Lefkowitz Affirmation, Ex. K (Dkt. 55-12)).) As Plaintiff wishes the court to consider the statements contained in these exhibits for their truth (see Matye Aff. ¶ 23), they are inadmissible hearsay, and, accordingly, will not be considered.

[9] Specifically, Plaintiff received "unsatisfactory" ratings in the categories of: (1) professional attitude and professional growth; (2) resourcefulness and initiative; (3) effect on character and personality growth of pupils; (4) control of class; (5) maintenance of wholesome classroom atmosphere; (6) planning and preparation of work; (7) skill in adapting instruction to individual needs and capacities; (8) effective use of appropriate methods and techniques; (9) skill in making class lessons interesting to pupils; (10) extent of pupil participation in the class and school program; (11) evidence of pupil growth in knowledge, skills, appreciations and attitude; (12) attention to pupil health, safety and general welfare; (13) attention to physical conditions of classroom; (14) housekeeping and appearance of room; (15) care of classroom equipment by teacher and children; and (16) attention to routine classroom matters. He received "satisfactory" ratings in the categories of: (1) attendance and punctuality; (2) personal appearance; (3) voice, speech and use of English; (4) attention to records and reports; (5) maintenance of good relations with other teachers and with supervisors; (6) effort to establish and maintain good relationships with parents; and (7) willingness to accept special assignments in connection with the school program. (2010-2011 Annual Review at 1.)

completion of probation. (Id.) In the 2010-2011 Annual Review, Terry cited in support of her recommendation observation reports and file letters dated November 5, 2010 (Vitale's Formal Observation Report); February 4, 2011 (Vitale's Formal Observation Report); March 9, 2011 (Terry's Informal Observation Report); April 6, 2011 (Vitale's Informal Observation Report); April 6, 2011 (Vitale's file letter re: closet door incident); April 7, 2011 (Zirin's file letter re: floor and auditorium incidents); and April 15, 2011 (Zirin's Informal Observation Report).[10] (Id.) Superintendent Philip Composto also recommended denial of certification of completion of probation.[11] (Id.; see also Defs.' 56.1 ¶ 145; Pl.'s 56.1 ¶ 145.)

Plaintiff appealed the recommendation at a hearing pursuant to the DOE teachers' collective bargaining agreement. (Defs.' 56.1 ¶ 146; Pl.'s 56.1 ¶ 146.) Plaintiff was represented at the hearing by counsel. (Defs.' 56.1 ¶ 146; Pl.'s 56.1 ¶ 146.) Ultimately, the appeal was denied, and Plaintiff was terminated from the DOE. (Defs.' 56.1 ¶ 147; Pl.'s 56.1 ¶ 147.)

15. I.S. 230's Record of FMLA Leave

Several teachers at I.S. 230 have taken FMLA leave during Principal Terry's tenure. (Defs.' 56.1 ¶ 130; Pl.'s 56.1 ¶ 130.) Terry approved seven individual requests for FMLA leave since the 2005-2006 school year, including Plaintiff's FMLA leave. (Defs.' 56.1 ¶¶ 131-132; Pl.'s 56.1 ¶¶ 131-132; Decl. of I.S. 230 Principal Sharon Terry ("Terry Decl.") (Stockman Decl.,

---

[10] In her supporting declaration, Terry asserts that Plaintiff's FMLA leave "did not factor into [her] decision to recommend that his probation be discontinued." (See Decl. of I.S. 230 Principal Sharon Terry ("Terry Decl.") (Stockman Decl., Ex. H (Dkt. 53-8)) ¶ 11.) This is of course an ultimate question in this litigation, and one that Plaintiff disputes on the basis of "all of the evidence in this case." (See Defs.' 56.1 ¶ 144; Pl.'s 56.1 ¶ 144.) The court does not consider this self-serving statement to be an undisputed fact.

[11] Oddly, Terry's recommendation is dated June 21, 2011, and Composto's is dated the prior day, June 20, 2011. (See 2010-2011 Annual Review.) Plaintiff has not argued that this document is inauthentic; accordingly, the court presumes that one of the two signatories made an error in the date when executing the document.

Ex. H (Dkt. 53-8)) ¶ 8.)[12] Terry has also approved a variety of other types of leave for employees during that time. (Defs.' 56.1 ¶ 131; Pl.'s 56.1 ¶ 131; Terry Decl. ¶ 8.)

## B. Procedural History

Plaintiff initiated this action on November 8, 2012. (See Compl.) Defendants answered the Complaint on January 4, 2013. (Answer (Dkt. 8).) Discovery proceeded before Magistrate Judge Viktor V. Pohorelsky.

On September 6, 2013, Defendants filed a letter requesting a pre-motion conference in anticipation of filing a motion for summary judgment. (Mot. for Pre-Mot. Conf. (Dkt. 32).) At the pre-motion conference, the court granted Defendants' request for leave to file a motion for summary judgment. (Sept. 25, 2013, Min. Entry.) On March 24, 2014, Defendants filed the fully briefed motion, which Plaintiff opposed. (See Not. of Mot. for Summ. J.; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") (Dkt. 54); see also Dkts. 51-53, 55-58 (additional motion papers).)

## II. LEGAL STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most

---

[12] Plaintiff objects that Terry has no ability to "approve" FMLA leave if an employee is eligible under the terms of the statute. (See Pl.'s 56.1 ¶¶ 131-132.) As Defendants note, however, an employee must be qualified to take FMLA leave, including by complying with an employer's customary notice requirements, and it is Terry's responsibility as administrator to ensure that employees do comply with leave procedures. (Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. 56) at 3 (citing 29 C.F.R. § 825.302(d)).)

favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In an employment discrimination or retaliation action, where an employer's intent is at issue, the trial court must use extra caution in determining whether to grant summary judgment, because "direct evidence of discriminatory [or retaliatory] intent is rare and must often be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); see also Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). However, a plaintiff "may not survive summary judgment merely by conjuring a hypothetical issue of material fact." Robinson v. Concentra Health Servs., Inc., No. 14-941-cv, --- F.3d ----, 2015 WL 1295149, at *2 (2d Cir. Mar. 24, 2015). The plaintiff "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Id. (internal citation and quotation marks omitted). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." Id. (internal quotation marks omitted).

29

## III. DISCUSSION

### A. FMLA Retaliation Cause of Action

The FMLA grants eligible employees the right to take up to twelve work weeks of unpaid leave per year in order to care for a newborn child. 29 U.S.C. § 2612(a)(1)(A). The employee has the right to return to the position held prior to the leave, or to an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a)(1). Additionally, "[t]he FMLA 'creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006) (quoting Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003)). A plaintiff may advance an FMLA action premised on a theory of interference with his or her FMLA rights, or a theory of retaliation for the exercise of those rights. See Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004) (per curiam). Plaintiff raises a retaliation claim.[13]

Plaintiff's claim that he was retaliated against for exercising rights under the FMLA is analyzed under the familiar McDonnell Douglas framework. Potenza, 365 F.3d at 168; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Accordingly, to make out a prima facie case for FMLA retaliation, Plaintiff must "establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza, 365 F.3d at 168. Under the McDonnell Douglas framework, the burden of establishing a prima facie case is "not onerous," Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981), and if Plaintiff meets that minimal initial burden,

---

[13] See Compl. ¶ 1; see also generally Pl.'s Opp'n (exclusively discussing retaliation theory).

the burden then shifts to Defendants to "<u>articulate</u> (not <u>prove</u>), via admissible evidence," a legitimate, non-retaliatory reason for the employment decision. <u>Tyler v. Bethlehem Steel Corp.</u>, 958 F.2d 1176, 1180 (2d Cir. 1992) (emphasis in original); <u>see also</u> <u>Achille v. Chestnut Ridge Transp., Inc.</u>, 584 F. App'x 20, 22 (2d Cir. 2014) (summary order). If Defendants articulate a legitimate reason for the adverse employment decision, Plaintiff must then demonstrate that the defendant's articulated reason was pretext for retaliation. <u>Serby v. N.Y.C. Dep't of Educ.</u>, 526 F. App'x 132, 134 (2d Cir. 2013) ("<u>Serby II</u>") (summary order) (citing <u>Papelino v. Albany Coll. of Pharmacy of Union Univ.</u>, 633 F.3d 81, 92 (2d Cir. 2011)). Plaintiff may do this by persuading "the trier of fact that a [retaliatory] reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." <u>Tyler</u>, 958 F.2d 1176, 1181 (citing <u>Burdine</u>, 450 U.S. at 256; <u>McDonnell Douglas</u>, 411 U.S. at 805).[14]

The causation standard that Plaintiff must satisfy at the pretext stage is currently an open question in this circuit. <u>See</u> <u>Brown v. Northrop Grumman Corp.</u>, No. 12-CV-1488 (JS) (GRB), 2014 WL 4175795, at *15-16 (E.D.N.Y. Aug. 19, 2014). Prior to the United States Supreme Court's 2013 decision in <u>University of Texas Southwestern Medical Center v. Nassar</u>, 133 S. Ct. 2517 (2013), "courts in this Circuit consistently held that a plaintiff asserting a retaliation claim under the FMLA needed to prove only that the FMLA leave was a motivating factor in the employer's adverse employment action, not that it was the only reason." <u>Brown</u>, 2014 WL 4175795, at *15; <u>see also, e.g.</u>, <u>McGuiness v. E. W. Indus.</u>, 857 F. Supp. 2d 259, 265 (E.D.N.Y. 2012) (noting that upon a defendant meeting its burden, a plaintiff must show that "his termination was, 'more likely than not, motivated in whole or part by discriminatory reasons'"

---

[14] The Second Circuit has never adopted the <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), mixed-motive approach to FMLA retaliation claims, nor held definitively that it is not available, <u>see</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 176 (2d Cir. 2006). This court need not determine whether it is available because Plaintiff does not argue that the court should analyze his claim in this manner. (<u>See generally</u> Pl.'s Opp'n.)

(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000))); Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 180 (E.D.N.Y. 2011) (holding that a plaintiff "need only show that [retaliation] was a motivating factor in the decision, even if defendant's proffered explanation is also credible"); Debell v. Maimonides Med. Ctr., No. 09-CV-3491 (SLT) (RER), 2011 WL 4710818, at *10 (E.D.N.Y. Sept. 30, 2011) ("To defeat summary judgment, plaintiff need not show that defendant's proffered reason was false or played no role in the decision to terminate him, but only that it was not the only reason, and that his filing for FMLA leave was at least one motivating factor." (citing Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009))).

In Nassar, the Supreme Court held that Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test" applicable to Title VII discrimination claims.[15] 133 S. Ct. at 2533. "[S]ince Nassar, courts within and without this Circuit have questioned whether the 'but-for' causation standard should now apply to FMLA retaliation claims, with varying results." Brown, 2014 WL 4175795, at *16 (collecting cases). Nassar based the determination in part on the text of Title VII's anti-retaliation provision, which makes it unlawful to "discriminate against" an employee "because he has . . . participated" in protected activity. See Nassar, 133 S. Ct. at 2528 (emphasis added) (quoting 42 U.S.C. § 2000e-3(a)). The Supreme Court had previously held in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), that age discrimination claims brought pursuant to the Age Discrimination in Employment Act ("ADEA"), which also uses the "because of" language, must be proved according to "but for" causation. See 557 U.S. at 176.

---

[15] The Second Circuit subsequently explained that, in this context, "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp., LLC, 737 F.3d 834, 846 (2d Cir. 2013).

Because the Second Circuit has not held that Nassar applies to FMLA retaliation claims, and because the language of the FMLA is not materially similar to that at issue in Nassar and Gross, see 29 U.S.C. §§ 2615, 2617, the court will apply the motivating-factor test to Plaintiff's claim. Accordingly, Plaintiff must demonstrate that Defendants "considered [his] FMLA leave as a 'negative factor in [their] decision to terminate.'" Serby v. N.Y.C. Dep't of Educ., No. 09-CV-2727 (RRM) (VVP), 2012 WL 928194, at *8 (E.D.N.Y. Mar. 19, 2012) ("Serby I") (quoting Sista, 445 F.3d at 176)), aff'd, Serby II; see also Potenza, 365 F.3d at 167 ("negative factor"); Sista, 445 F.3d at 176 ("negative factor").

### B.    Application

Defendants seek summary judgment on the grounds that (1) Plaintiff cannot put forth evidence sufficient to raise an inference of retaliatory intent necessary to satisfy the fourth element of his prima facie case, and (2) even if Plaintiff could meet his prima facie burden, he cannot establish that Defendants' articulated legitimate, non-retaliatory reason for his termination was pretextual. (See generally Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. 51).) Because Defendants have articulated a legitimate, non-retaliatory reason or reasons for Plaintiff's termination—poor performance, consisting of poor teaching and lesson-planning; poor classroom management; and failure to implement supervisor recommendations—supported by admissible evidence, the court will assume that Plaintiff can satisfy the minimal burden of a prima facie case, and move directly to the pretext stage of the analysis. See Chen v. City Univ. of N.Y., No. 11-CV-0320 (RA), 2014 WL 1285595, at *7 (S.D.N.Y. Mar. 31, 2014) (citing Idrees v. City of New York, No. 04-CV-2197 (LAK) (GWG), 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (report and recommendation) ("Despite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court

33

may simply assume that a plaintiff has established a prima facie case and skip to the final step in the <u>McDonnell Douglas</u> analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action."), <u>adopted</u>, No. 04-CV-2197 (LAK) (GWG) (S.D.N.Y. Feb. 13, 2009), ECF No. 58, <u>aff'd</u>, 388 F. App'x 62 (2d Cir. 2010) (summary order)); <u>see also</u> <u>Serby I</u>, 2012 WL 928194, at *8; <u>Di Giovanna</u>, 651 F. Supp. 2d at 205; <u>Shah v. Eclipsys Corp.</u>, No. 08-CV-2528 (JFB) (WDW), 2010 WL 2710618, at *11-13 (E.D.N.Y. July 7, 2010).

Defendants state that Plaintiff's probationary status was terminated due to poor performance, consisting of poor teaching and lesson-planning; poor classroom management; and failure to implement supervisor recommendations. The factual record strongly supports Defendants' articulated reasons. Indeed, Plaintiff does not dispute the facts behind these reasons. It is undisputed that Plaintiff failed to implement supervisor recommendations, including decorating his classroom with curtains or ropes in order to create the feel of a theater; adding a "word wall" and posting "sentence stems" in the classroom; creating a "glows" and "grows" chart; and posting the lesson objective on the board throughout each class session. It is undisputed that students misbehaved while under Plaintiff's supervision, including running in the classroom[16]; breaking a closet door; refusing to sit down when instructed to do so; "writhing" on the floor and mocking an injured student; talking during class instruction; refusing to work on the class worksheet; and "yelling and goofing off" during class. It is undisputed that Plaintiff yelled at his students. It is undisputed that Plaintiff taught the lessons that Defendants rated unsatisfactory, including a lesson in which he "impromptu" decided to show the movie <u>Cat on a Hot Tin Roof</u> and did not have a written lesson plan; and a lesson in which he showed the movie

---

[16] Running did not only occur during the hide-and-seek incident; Plaintiff agreed that the student who fell and hit her head and was taken to the nurse's office had been running during class. (<u>See</u> Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)

<u>West Side Story</u> to all of his classes over a week-long period, and the lesson plan for which did not vary from day-to-day or class-to-class.

Nonetheless, Plaintiff contends that he was not terminated for the reasons cited by Defendants. He argues, in effect, that Defendants were not motivated by the facts described above, and/or that they should not have cared about them. He argues that an inference of retaliation should be raised by a temporal link between his informing the school of his intention to take FMLA leave and the negative evaluations in his teacher file, as well as by certain statements made by Principal Terry to Plaintiff and to others.

Specifically, Plaintiff argues that no "piece of paper, document, or any evidence whatsoever prior to March 27, 2011" (i.e., after Plaintiff notified the school that he would be taking FMLA leave) supports Defendants' articulated reasons for his termination. (Pl.'s Opp'n at 15.) Plaintiff contends that he received all positive evaluations until this date, and thereafter the administration fabricated negative evaluations to support a retaliatory termination. The problems with Plaintiff's temporal theory are twofold.[17] First, although a temporal link between the exercise of FMLA rights and an adverse action can raise an inference of discrimination, the facts in this case do not support such an inference. Second, as explained above, as Plaintiff admits that the descriptions included on those negative evaluations are accurate, his disagreement that they warranted an "unsatisfactory" rating does not support a finding of pretext. However, the court finds that other evidence in the record warrants the denial of Defendants' motion for summary judgment. As discussed below, certain statements made by Principal Terry, viewed in the light most favorable to Plaintiff, are sufficiently probative of retaliatory motivation to raise a genuine dispute of fact and require denial of the motion.

[17] Notably, Plaintiff fails to cite a single case in support of his argument in his opposition briefing. (<u>See</u> Pl.'s Opp'n at 4-18.)

35

1. Temporal Proximity

Although "temporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a prima facie retaliation claim," Kim v. Columbia Univ., 460 F. App'x 23, 25 (2d Cir. 2012) (summary order), where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).[18] Similarly, where written or verbal recommendations for improvement predated the protected activity, and the failure to implement these recommendations "eventually formed the stated basis for Plaintiff's termination," no inference of retaliation arises. Nielsen v. N.Y.C. Dep't of Educ., No. 04-CV-2182 (NGG) (LB), 2009 WL 301944, at *6 (E.D.N.Y. Feb. 6, 2009). Here, although Plaintiff did not receive any written observation reports that rated his lessons "unsatisfactory" until after he informed the school that he would be taking FMLA leave, he received the recommendations that he admittedly did not implement well before that date—in meetings with both Terry and Vitale in November 2010, and with Vitale in February 2011, and in observation reports received November 24, 2010, and March 11, 2011. Furthermore, Principal Terry informed Plaintiff on March 10, 2011, that she intended to give an "unsatisfactory" rating to his Cat on a Hot Tin Roof lesson from the prior day. The March 9, 2011, Informal Observation Report, which Plaintiff received after he returned from sick leave, is consistent with this verbal feedback. Moreover, as March 10, 2011, was a Thursday, and Plaintiff took his sick

---

[18] Additionally, temporal proximity alone is not sufficient to meet a plaintiff's burden at the pretext stage; more is required to rebut a defendant's legitimate, nonretaliatory reason for an adverse action taken against a plaintiff, at least in the context of a Title VII retaliation claim. See Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014); see also Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) (holding that temporal proximity, plus more, such as inconsistent employer explanations for termination, shows pretext); Museau v. Heart Share Human Servs. of N.Y., No. 12-CV-1851 (DLI) (MDG), 2014 WL 1277006, at *8 (E.D.N.Y. Mar. 27, 2014) (requiring more than temporal proximity at pretext stage of FMLA retaliation claim).

leave beginning March 15, 2011, the following Tuesday,[19] Plaintiff was only in the school for two days following that meeting with Terry, and then did not return until after he had informed the school of his intention to take FMLA leave. The fact that Plaintiff did not receive the written report during that two-day period does not suggest an untoward motivation.[20] In this context, no inference of retaliation is raised from administrators' eventual determination that Plaintiff's lesson-planning and failure to implement classroom recommendations were "unsatisfactory," even though these ratings were not memorialized in writing until after March 27, 2011.

Similarly, no inference of retaliation is raised from the timing of the meetings and letters to Plaintiff's file regarding the three incidents that occurred on March 3, 2011. Dean Bloch's affidavit, which Plaintiff submitted in support of his position, affirmed that it was "appropriate" for a meeting regarding these incidents to be held on some date after the incident, rather than discussed immediately. (See Bloch Aff. ¶ 8.) And where Plaintiff was not available from March 15, 2011, until March 29, 2011, it is not inherently suspicious that the meetings were not held until April 1, 2011. Additionally, it is logical that letters memorializing the incidents would await these meetings, so that Plaintiff had an opportunity to explain what had occurred.

### 2. Subjective Disagreement and Disparate Treatment

Plaintiff spends much of his opposition papers arguing that Defendants were simply wrong to rate him "unsatisfactory" in response to the undisputed facts discussed above. For example, he argues that he was correct not to start a new unit in the special education class that Terry observed on March 9, 2011, with many students absent (Pl.'s Opp'n at 11-12); he argues

---

[19] The court takes judicial notice of the 2011 calendar. See Fed. R. Evid. 201.

[20] Additionally, Plaintiff's receipt of the March 9, 2011, Informal Observation Report approximately one month after the observation does not appear inconsistent with prior practice at I.S. 230: Plaintiff did not receive a copy of Vitale's February 4, 2011, Formal Observation Report until March 11, 2011, which, notably, was prior to Plaintiff informing the school of his intention with respect to FMLA leave.

that the closet door incident and the floor incident were the product of student misbehavior and they "should not have been held against him" (id. at 16-17); he contends that he should not have received a poor evaluation for failing to implement recommendations, because recommendations "were not meant to be treated as requirements" (id. at 19-21); and he complains that he "did not have a teacher's edition book to follow, he had to come up with everything all on his own, basing it off of state standards, and his own personal experiences" (id. at 21). (See also Apr. 13, 2011, Pl. Ltr. to File at 1 (Plaintiff stating that he "disagree[d] and ignored" the administrators' request to decorate his classroom and provide a "theater feel").) But the court is "'decidedly not interested in the truth of the allegations made against plaintiff' when evaluating pretext." Mathew v. N. Shore-Long Island Jewish Health Sys., Inc., 582 F. App'x 70, 71 (2d Cir. 2014) ("Mathew II") (summary order) (citing McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)). "Instead, '[it is] interested in what motivated the employer.'" Id. (citing McPherson, 457 F.3d at 216).

Therefore, "while [P]laintiff disagrees with [his] performance ratings, a 'plaintiff's subjective disagreement with [his performance] reviews is not a viable basis for a discrimination [or retaliation] claim." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012) (quoting Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999)); see also Serby II, 526 F. App'x at 134 ("[Plaintiff] disagrees, apparently, with the School's judgment that chewing gum and wearing hoods in class are serious concerns, but we have no basis to second-guess these educational policy decisions, and these disagreements do not support her claim of retaliation."); Thomsen v. Stantec, Inc., 483 F. App'x 620, 622 (2d Cir. 2012) (summary order) ("[Plaintiff] does not actually dispute the specific instances of errors in his performance, but only contends that such mistakes were inevitable or were the fault of

others. Given the uncontested defects in his work, it is not for us to second-guess [the employer]'s standards of performance, absent affirmative evidence—of which [plaintiff] offers none—that [the employer]'s evaluation of [plaintiff]'s performance was not in good faith." (citing Dister v. Continental Grp., Inc., 859 F.2d 1108, 1116 (2d Cir. 1998) (noting that "the reasons tendered" by the company "need not be well-advised, but merely truthful"))); Nielsen, 2009 WL 301944, at *5 (holding that excuses made by plaintiff for his job performance issues did not demonstrate discrimination or retaliation (citing Droutman v. N.Y. Blood Ctr., Inc., No. 03-CV-5384 (DRH) (ARL), 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005) (in context of employee misconduct, "the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination"))). Instead, "[t]hat an evaluation is tainted by discriminatory motives can be shown if [the plaintiff] can point to [a] similarly situated employee who was evaluated differently." Sotomayor, 862 F. Supp. 2d at 259; see also Mathew II, 582 F. App'x at 71 ("To establish pretext based on selective enforcement, [a plaintiff] must show that he was treated differently than other 'similarly situated' employees." (citing Henry v. Daytop Vill., Inc., 42 F.3d 89, 96-97 (2d Cir. 1994))).

Plaintiff additionally fails to establish pretext through evidence of disparate treatment as compared to similarly situated employees. Plaintiff contends that other teachers in the arts department "were not required to utilize specific teaching methods," apparently referring to the recommendations that he implement "word walls," "sentence stems," and a "glows" and "grows" chart. (Pl.'s Opp'n at 19.) However, there is absolutely no evidence of how other arts teachers at I.S. 230 conducted their classes, how they were reviewed by school administrators, or what recommendations were made with respect to their classroom layout or design or teaching methods. Plaintiff's affidavit attempts to raise an issue of fact by stating that "[n]one of the other

39

arts teachers . . . were required to utilize specific teaching methods like these," and that "[i]n choir class the students sing; in guitar they play guitar; in band they play an instrument." (Matye Aff. ¶ 43.) But there is no basis on which the court can determine that these statements are made on personal knowledge, rather than mere self-serving conjecture. Plaintiff provides no specifics; he does not state that he ever witnessed one of these classes or read one of his co-workers' observation reports; and in his deposition he could not even remember the names of the choir, band, guitar, or visual arts teachers. (Matye Dep. at 59:2-10.) He has not submitted testimony by any of these individuals supporting his assertions. Moreover, even if there were evidence in this case that the music teachers were not asked to use literacy-building tools, this alone would not prove retaliation. Plaintiff has submitted no evidence that any other teacher at the school failed to implement whatever recommendations were made to his or her teaching without negative consequences. See Mathew v. N. Shore-Long Island Jewish Health Sys., Inc., No. 11-CV-6022 (JBW), 2013 WL 5799883, at *9 (E.D.N.Y. Oct. 23, 2013) (discounting plaintiff's unsupported allegations that he was treated differently than co-workers who he claimed approached their time sheets in the same way he did, because he offered no evidence to support his deposition testimony that other employees swapped shifts or were paid for days they did not work, and granting summary judgment because plaintiff could not prove that employer's reason for termination—plaintiff's falsification of time sheets—was pretext), aff'd, Mathew II.

### 3. Administrators' Statements

Having determined that Plaintiff has failed to put forth evidence of retaliation through the timing of his negative evaluations or his subjective disagreement with the "unsatisfactory" ratings, and that he has submitted no evidence of disparate treatment as compared to similarly-situated employees, the court now considers whether any of the statements made by school

40

administrators might support a finding of pretext and a retaliatory motivation behind his termination. See Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." (citing cases)). The following statements made by Terry are at issue,[21] considered in the light most favorable to Plaintiff:

- In December 2010, Plaintiff told Terry that he would be taking two weeks (ten school days) of paid sick leave upon the March 2011 birth of his child. Terry responded: "You're not taking more than two weeks, are you?"

- During a March 16, 2011, phone call, in which Terry inquired as to why Plaintiff was not at work, and Plaintiff informed her that his child had been born and that his ten days of sick leave had begun, Terry stated that it would reflect poorly on Plaintiff's end-of-year review if he took any more than ten days off.

- On April 15, 2011, Terry said to Plaintiff, "Because of the incidences that have happened and because you can't even complete the school year, . . . I'm not going to grant you tenure, I'm going to deny you tenure outright."

- After Plaintiff's final day at I.S. 230, Terry stated during an assembly for drama students in the school auditorium, with approximately 45 students in attendance, that Plaintiff was "irresponsible" and that he "quit."

The first three of these statements can be viewed as innocent or suspicious. With respect to the first two statements, Terry either could have been (1) implying that she would be displeased and retaliate accordingly against Plaintiff if he were to take additional, non-sick leave, such as FMLA leave; or (2) simply reminding him that pursuant to the school's sick leave policy, and his sick day bank, ten days was the maximum amount of time permitted. The third statement could either (1) be taken to indicate that Terry intended to deny tenure to Plaintiff because she

---

[21] It is undisputed that Zirin did not say anything negative to Plaintiff with respect to his FMLA leave. And although in retrospect Plaintiff construes as "negative" Vitale's response to Plaintiff's apology for having to leave again upon his return from sick leave—i.e., that he should not feel bad, because "sometimes you have to put your family before your career"—the court does not take this statement to reflect any retaliatory motivation or animus.

was angry that he was taking FMLA leave; or (2) simply mean that his record at that point was insufficient to recommend tenure, and that there would be no opportunity for improvement thereof over the next several months, given Plaintiff's FMLA leave.[22] The fourth statement, in the court's view, is inherently more suspicious. The word "irresponsible" could, theoretically, refer to Plaintiff's classroom behavior and lesson-planning; however, in the context of an assembly called to discuss why the school would not have a drama teacher for the remainder of the school year, the plain meaning of the terms "irresponsible" and "quit" raise a strong inference that Terry associated Plaintiff's taking FMLA leave with Plaintiff abandoning his students, and that she was displeased with him for doing so. Importantly, the court must consider these statements in the light most favorable to Plaintiff—in other words, in the more suspicious light.

These comments cannot be discounted as so-called "stray remarks" that, without more, would be insufficient to prove pretext. Cf. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (noting that "stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination"). "Where the evidence of discriminatory [or retaliatory] intent is a statement, a comment will be considered a probative statement that 'evinces an intent to discriminate [or retaliate],' rather than a 'stray remark,' based on:

> '(1) who made the remark, i.e., a decisionmaker, a supervisor, or a
> low-level co-worker; (2) when the remark was made in relation to
> the employment decision at issue; (3) the content of the remark,
> i.e., whether a reasonable juror could view the remark as
> [retaliatory]; and (4) the context in which the remark was made,
> i.e., whether it was related to the decision making process.'"

St. Louis v. N.Y.C. Health & Hosp. Corp., 682 F. Supp. 2d 216, 230 (E.D.N.Y. 2010) (quoting Silver, 490 F. Supp. 2d at 363); see also Tomassi v. Insignia Fin. Grp., 478 F.3d 111, 115 (2d

---

[22] Although the statement does not explicitly mention terminating Plaintiff's employment, the court construes "deny you tenure outright" to refer to termination, as opposed to a continuation of probation which could presumably lead to tenure after an additional year.

42

Cir. 2007) ("The more the remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."). Terry's statements meet the "probative" criteria. Each was made by the very administrator who recommended terminating Plaintiff's employment; each could be viewed by a reasonable juror as evincing a retaliatory motive; each were made explicitly in connection with Plaintiff's taking leave from teaching, and three were made directly to Plaintiff in such context; and the final two remarks occurred very close in time to the decisionmaking process. Accordingly, although Defendants have adduced strong evidence that Plaintiff faced varied classroom issues, the court cannot say that a reasonable jury could not find, on the basis of these statements, that Defendants' articulated reason for Plaintiff's termination was pretextual, and that his exercise of FMLA leave rights constituted a negative, motivating factor in his termination. See Tomassi, 478 F.3d at 116 (reversing district court's grant of summary judgment in case brought pursuant to ADEA in part because of "remarks . . . made by the person who decided to terminate [the plaintiff,] . . . [which] could reasonably be construed . . . as explaining why that decision was taken"). Accordingly, Defendants' motion for summary judgment is DENIED.

### 4. Terry's Alleged False Statements

Plaintiff argues in his opposition papers that additional statements made by Terry—specifically, statements made at the DOE hearing regarding Plaintiff's appeal of his termination, as well as testimony given during Terry's deposition in this case—raise an inference of retaliatory intent and pretext. First, Plaintiff argues that Terry intentionally lied at the DOE hearing regarding the closet door incident, by stating that one of the students had been locked inside the closet, when this would have been physically impossible. (Pl.'s Opp'n at 5-8; see also Audio Recording of Nov. 14, 2011, DOE Hr'g (Lefkowitz Affirmation, Ex. X (hard copy DVD

43

in court's possession)).) Second, Plaintiff argues that Terry lied at her deposition, by stating that she was unaware that any petition had been circulated regarding Plaintiff's possible reinstatement, and that she did not make any statements to any of Plaintiff's former students regarding why he would not be returning; when asked if she told any of the students that Plaintiff "quit or abandoned them," she replied that she "did not." (Id. at 9-10 (quoting Terry Dep. at 69:3-20).) Plaintiff contends that Terry's alleged false statements at the DOE hearing indicate "awareness that the 'evidence' alone would be insufficient" to justify Plaintiff's termination; and that, faced with all of the alleged prior false statements, a jury would be entitled to "disregard Terry's entire testimony." (Id. at 5, 10.) Defendants argue that Terry's statements at the DOE hearing do not indicate retaliation or intentional fabrication, but rather an understanding of the event that was based on an Occurrence Report drafted by Dean Espinal (Defs.' Reply at 5-7 (citing Mar. 3, 2011, Espinal Occurrence Rep.)), and they question the admissibility of the audio recording of the DOE hearing[23] (id. at 5).

Because the court has found that Terry's statements to Plaintiff and to the student assembly raise a genuine dispute as to retaliatory motivation, supra Part III.B.3, the court need not determine at this stage in the litigation whether the audio recording of Terry's unsworn DOE statements will be admissible at trial, or what the probative value of those past statements will be, if any. Additionally, the jury will have the duty to resolve the dispute of fact created by the discrepancy between Terry's deposition testimony and that of A.T. The court takes no position and makes no assumptions regarding this factual dispute.

---

[23] Defendants are correct that the purported written excerpts of DOE hearing testimony, which appear to be drafted by Plaintiff's counsel, are inadmissible. (See Excerpt from Nov. 14, 2011, DOE Hr'g (Lefkowitz Affirmation, Ex. T (Dkt. 55-21)); Excerpt from Nov. 14, 2011, DOE Hr'g (Lefkowitz Affirmation, Ex. U (Dkt. 55-22)).)

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     March 31, 2015

NICHOLAS G. GARAUFIS
United States District Judge